IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Paula R. Broadwater-Courtney,   :  Case No. 3:07CV0074

   Plaintiff,        :

vs.             :

Commissioner, Social Security Administration, :  **MEMORANDUM DECISION**
                 **AND ORDER**

   Defendant.      :


   The parties have consented to have the undersigned Magistrate enter judgment in this case.

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final

determination denying her claim for disability insurance benefits (DIB) under Title II of the Social

Security Act (Act), 42 U.S.C. §§ 416 (i) and 423.  Pending are issues arising from the briefs of the parties

and Plaintiff's Reply (Docket Nos. 20, 21, & 22).  For the reasons set forth below, the Commissioner's

decision is affirmed.

### PROCEDURAL BACKGROUND

   Plaintiff filed an application for Title II DIB on October 9, 2002, alleging that she had been

disabled since February 14, 2002 (Tr. 114-116).  The application was denied initially and upon

reconsideration (Tr. 94-97, 99-101).  Plaintiff requested an administrative hearing, and on April 13, 2005, Administrative Law Judge (ALJ) Melvin Padilla conducted such hearing (Tr. 102, 45).  Plaintiff, represented by counsel, Sandra Gerhardt, Vocational Expert (VE) Vanessa Harris, and Medical Expert (ME) Dr. Mary Buban appeared and testified.  The ALJ issued an unfavorable decision on November 25, 2005 (Tr. 17-40).  On November 6, 2006, the Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the Commissioner's final decision (Tr. 8-10).

## JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## FACTUAL BACKGROUND

On April 13, 2005, Plaintiff was a 34 year-old divorced woman who weighed 216 pounds  (Tr. 21, 48).  She had received an associate's degree in website design and was taking courses to complete a bachelor's degree in information technology (Tr. 23, 49, 67).  Plaintiff resided in her sister's real property, rent-free, and her parents paid her utility bills (Tr. 49, 654).  Plaintiff had a driver's license and she drove a couple of times weekly (Tr. 48, 49).

From January to November 2004, Plaintiff worked at ITT Technical Institute as a math tutor on a part-time basis (Tr. 50).  Three weeks prior to the hearing Plaintiff worked for one month as a cashier; however, she was unable to stand long enough to perform her job duties (Tr. 50).  Plaintiff's past work included a customer service representative position (Tr. 21).  At the time of the hearing, Plaintiff was

2

unemployed and had no source of income (Tr. 48, 49).

Plaintiff testified that she had physical and mental impairments.  After eight knee surgeries involving her right hip and tibia and the placement of "screws" in her knees, Plaintiff continued to encounter constant sharp, shooting pain that was more pronounced in her right knee.  Because she had no medical insurance, she had to forgo additional surgery (Tr. 53, 54).  She testified that she was being treated at the Good Samaritan Internal Medicine Clinic with visits at three- month intervals (Tr. 55).

Plaintiff was sexually assaulted at her workplace in early 2002.  The aftermath of the sexual assault included symptoms and/or signs of depression, persistent crying, suicidal ideations, panic and anxiety attacks in public settings, fear of men and nightmares (Tr. 51, 65, 67).  Plaintiff was diagnosed with bipolar disorder manifested by mood swings.  About every three months, she experienced a manic phase that lasted for 48 hours.  During this phase, Plaintiff had insomnia and laughed and talked uncontrollably (Tr. 66).  During the three months prior to the hearing, Plaintiff left her home only twice. Except for daily calls to her mother, Plaintiff had little contact with the general public (Tr. 52).

Plaintiff consulted a counselor on a monthly basis.  Her symptoms were treated with Seroquel®, Lithium, Ativan, Nexium®, Voltaren and Bentyl ® (Tr. 53, 56).  In fact, she was participating in a study of Seroquel®[1].  The Bentyl was prescribed to treat irritable bowel syndrome (IBS).  The Voltaren

---

[1]

     Seroquel® is approved to treat the depressive episodes and the acute manic episodes in bipolar disorder and to treat schizophrenia.  Www.seroquel.com.  The Midwest Clinical Research Center conducted a study during which Plaintiff's baseline consumption was ascertained and her subsequent consumption was monitored (Tr. 768-768).  At the time of the hearing, the monitoring was ongoing.

aggravated her bowel, causing bleeding in her stomach and bloody stools (Tr. 56).

During a typical night, Plaintiff slept four to eight hours (Tr. 52).  Her daily activities included frequent crying, contemplating ending her life, using her computer and watching television (Tr. 59, 62, 65).  Plaintiff fed her cat in the morning (Tr. 62).  She prepared microwave meals and did her laundry. Plaintiff's niece or her sister performed all her other household chores (Tr. 58).  Within the last year she had been to the movie and attended church once (Tr. 59).

Plaintiff estimated that she could stand in one place for five to seven minutes, sit for no longer than two hours at time, walk for thirty minutes and lift from six to ten pounds (Tr. 56, 57).

Dr. Mary Buban, ME,  summarized the inconsistencies in Plaintiff's medical history and treatment record and concluded that the record was based, in large part, on Plaintiff's complaints (Tr. 83). Dr. Buban, a clinical psychologist, explained that Plaintiff could not have a marked inability to concentrate and obtain an associate's degree, maintain a 3.83 grade point average and tutor other students up to twenty hours weekly.  The severity of her limitations was not reflected in her treating psychiatrist's records but was exaggerated by her primary physician (Tr. 81, 82).  Overall, Plaintiff's impairments did not meet or equal any of the impairments in the Listing (Tr. 80).

The VE testified that a hypothetical person of Plaintiff's age, education, past work experience, limited to standing and/or walking up to five hours daily, restricted to low stress jobs not dealing with the public, could perform at the semiskilled level, Plaintiff's past relevant work of quality assurance monitor and computer support technician.  Consistent with jobs listed in the *Dictionary of Occupational Titles*, the hypothetical plaintiff could also perform work as an audit clerk, account clerk and adjustment

clerk.  There were 8,000 clerk jobs in the region (Tr. 87).

At the unskilled level, the hypothetical plaintiff could perform work as a labeler, microfilm processor and box inspector.   A minimum of 4,500  and a maximum of 10,000 such jobs exist in the region (Tr. 88).

The hypothetical plaintiff qualified for positions such as data entry clerk, information clerk and procurement clerk. at the semiskilled, sedentary level.  Approximately 9,000 clerk jobs exist in the region at this level (Tr. 88).

At the unskilled, sedentary level, the hypothetical plaintiff could perform work as an addresser, table worker or nut sorter.   These jobs were representative of approximately 31,000 jobs in the Dayton/Springfield, Ohio, region (Tr. 88).

The hypothetical plaintiff with little or no ability to concentrate, understand and remember detailed instructions, maintain attention and concentration for extended periods or work close to others without being distracted, could not maintain employment (Tr. 90).  The VE suggested that a worker with absences up to three times monthly would probably  be unable to maintain competitive employment (Tr. 89).

## **MEDICAL EVIDENCE**

### *1998*

Plaintiff underwent physical therapy in May (Tr. 172-174).  When Plaintiff's knee "gave out" in November, Dr. James J. Klosterman attributed the weakness to narrowing and degenerative changes and some spurring formation in the right knee and narrowing of the joint formed by her kneecap and femur

(Tr. 178). The results of the X-ray administered on December 23rd, showed degenerative change in the joint formed by Plaintiff's kneecap and femur (Tr. 462). Dr. David Mesker treated Plaintiff for reflux in October (Tr. 648).

### *1999*

In January, Plaintiff engaged in a physical therapy program with the goals of easing right knee pain, increasing ability to ambulate and perform activities of daily living and avoiding further surgery (Tr. 211, 462). However, in February, Plaintiff underwent arthroscopic debridement of the right knee (Tr. 192-194). After surgery, electrical stimulation and physical therapy were used to control edema and to increase the strength of Plaintiff's right knee (Tr. 197-205). On March 11th, Plaintiff was discharged from physical therapy (Tr. 182-187, 214). Dr. Mesker treated Plaintiff for an upper respiratory infection on March 12th. In April, Dr. Mesker continued the use of an immobilizer to treat what he suspected to be a soft tissue strain or tear (Tr. 641).

The X-ray of Plaintiff's right knee administered in April showed intact bone structures of the right knee (Tr. 215). Plaintiff hyperextended her knee on April 26th and returned to therapy (Tr. 227). Plaintiff was discharged from physical therapy on May 27th having made objective and functional gains (Tr. 217).

Plaintiff underwent physical therapy beginning on June14th (Tr. 273-275, 278-288, 294). In July, Dr. Pietro Seni opined that the 30 and 60 degree angle views revealed severe osteoarthritis in the joint formed by her kneecap and femur (Tr. 454). On August 14th, surgery was performed on Plaintiff's right knee during which a self-retained retractor and two screws were inserted (Tr. 258-262). In September,

6

Plaintiff was treated on an emergency basis for an allergic reaction to the pain reliever OxyContin ® (Tr. 265).  She was prescribed a knee cap brace since apparently her knee "popped" during the allergic reaction (Tr. 268).

Plaintiff was prescribed a nasal inhaler on September 13th to prevent her from gasping for air while sleeping (Tr. 636).  On October 12th, Dr. David Meeker noted that Plaintiff had mild dsythmia related to prolonged problems with her right knee (Tr. 631).  The venous Doppler study of Plaintiff's right knee, however, was normal (Tr. 299).  Plaintiff was discharged from therapy on October 25th as she had reached the maximal benefit from therapy (Tr. 300).

Dr. William R. Kelley assessed Plaintiff' residual functional capacity in November, finding that she could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about two hours in an eight-hour workday, sit about six hours in an eight-hour workday and engage in unlimited pushing and pulling (Tr. 312).  Plaintiff was limited to occasionally climbing ramps, stairs, kneeling and crawling but she should never climb using a ladder, rope or scaffold (Tr. 313).  Dr. Kelly found no communicative, environmental, visual or manipulative limitations (Tr. 313-316).

### *2000*

In September, X-rays revealed no evidence of acute bony abnormalities in Plaintiff's fifth toe (Tr. 320).  Plaintiff fell on November 21st, spraining her right knee (Tr. 321, 322).  Her knee was immobilized and she was prescribed crutches for mobilization and Vicodin® for pain (Tr. 325).  In December, 2000 Dr. Mesker prescribed medication for an upper respiratory infection (Tr. 628).

### *2001*

7

In January Plaintiff was treated again for an upper respiratory infection (Tr. 627). In May, Plaintiff underwent surgery to remove her gallbladder (Tr. 329). Dr. Mesker continued the prescription of pain reliever for Plaintiff's knee and prescribed an antibiotic for the treatment of the upper respiratory infection (Tr. 622). In August, a skin lesion was removed from her right hand (Tr. 621). Plaintiff was treated for laryngitis and bronchitis in September (Tr. 619).

### *2002*

Plaintiff was treated for a migraine headache on January 17 (Tr. 612). Plaintiff was diagnosed with post traumatic stress disorder on February 18th and admitted to a treatment program at the Miami Valley Hospital which involved intensive outpatient services (Tr. 348, 349-426). Upon admission, her social, occupational and psychological functioning was seriously impaired (Tr. 348, 352). When released on March 18th, Plaintiff's clinical condition had improved to the extent that she could be treated using a less intensive level of service (Tr. 351).

In the interim, Dr. Kelly Predieri, Ph.d. treated Plaintiff for major depression from February to September (Tr. 498-515). On March 1st, she was prescribed new drug therapy for the treatment of rash/ hives (Tr. 609). On March 10th, Dr. Bocock diagnosed her with acute anxiety and acute situational anxiety (Tr. 331, 333). After interviewing her, the social worker diagnosed Plaintiff with situational depression (Tr. 342). On March 27, Dr. Nancy Smith diagnosed Plaintiff with an adjustment disorder, mixed anxiety and depression (Tr. 655).

In August, Dr. Mahmood Rahman considered the differential diagnosis of bipolar disorder (Tr. 428). Plaintiff went to the Kettering Medical Center on September 16 complaining of left knee pain (Tr.

8

432).  Later she underwent a surgical procedure to reposition her kneecap (Tr. 435-437).  During her follow-up visit in October, Plaintiff could bend her knee 90 degrees.  Dr. Richard Forster found that Plaintiff was healing  nicely (Tr. 443).

Dr. David A. Rath assessed Plaintiff' residual functional capacity in November, finding that she could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and engage in unlimited pushing and pulling (Tr. 473).  Plaintiff was limited to occasionally kneeling and crawling.  Otherwise there were no postural, communicative, environmental, visual or manipulative limitations (Tr. 474-475).

*2003*

On January 6th, Dr. Michael D. Wagner, Ph.D., diagnosed Plaintiff with post-traumatic stress syndrome and major depressive disorder, neither of which satisfied the diagnostic criteria of the Listing (Tr. 482, 484).  He further opined that Plaintiff was markedly limited in her ability to interact with the general public but moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted, complete a normal workweek, ask simple questions, accept instructions and respond appropriately to criticism, get along with co-workers and maintain socially appropriate behavior (Tr. 493-494).

On October 8th, Plaintiff underwent a crisis intervention assessment (Tr. 549).  During the course of her care, the therapist examined Plaintiff's thoughts of suicide and symptoms of depression (Tr. 549-

9

561).  Following a colonscopy in November, Dr. Rolando Sineneng concluded that Plaintiff's rectal bleeding secondary was most likely secondary to internal hemorrhoids.  He recommended a high fiber diet (Tr. 524).

## *2004*

At least once monthly from January to April, Plaintiff addressed anger issues with a licensed social worker (Tr. 674-679).  Plaintiff was treated for gastrointestinal bleeding on January 21st (Tr. 564).  An X-ray showed a nonspecific, non-obstructive abdomen (Tr. 573).

During the course of treatment commencing in February, Dr. Bernadette D'Souza noted that the following signs:  appetite disturbance, sleep disturbance, mood disturbances, difficulty thinking decreased energy, manic syndrome and generalized persistent anxiety (Tr. 723).  She also observed that Plaintiff had marked deficiencies of concentration, persistence and pace (Tr. 725).

In March, Plaintiff was diagnosed with moderate gastritis (Tr. 579).  The biopsy of the gastric muscosa showed mild chronic superficial inflammation (Tr. 580).

Dr. Mesker found in March that Plaintiff was impaired by major depression, bipolar disorder, chronic low back pain and chronic bilateral knee pain (Tr. 592).  Her ability to relate to the public, deal with work stressors and maintain attention/concentration was poor (Tr. 591).  She could, however, occasionally lift and carry twenty pounds and frequently lift and carry ten pounds, stand and walk for two hours and stand and walk without interruption for one quarter of an hour, sit for four hours and sit without interruption for half an hour (Tr. 587).

X-rays of Plaintiff's chest dated August 25th, showed a normal heart in size and a linear density

10

in the left lung base (Tr. 707).

<u>**2005**</u>

After a clinical interview on January 17th, Dr. J. William McIntosh, Ph.D., diagnosed Plaintiff with major depression, post-traumatic stress disorder, mobility difficulties, knee and hip pain, obesity, stomach ulcers and orthopedic problems (Tr. 693).  He opined that Plaintiff had a poor ability to understand and remember detailed instructions, maintain attention for concentrated periods, work with or near others without being distracted, perform at a consistent pace, interact appropriately with the public, ask simple questions, accept instructions, get along with co-workers and travel in unfamiliar places (Tr. 695-696).

An independent medical examiner, Dr. Stephen S. Duritsch, found that kneeling, climbing, crawling or lifting more than twenty pounds were contraindicated.  Plaintiff could sit without restrictions and she had unrestricted use of her upper limbs (Tr. 682).  With the exception of the flexion in Plaintiff's dorsolumbar spine and knees, the range of motion in her cervical spine, shoulders, elbows, wrists, hands and fingers, hip and ankles was normal (Tr. 683-686).

<u>**2006**</u>

From May 6th through February 10th, Plaintiff underwent individual counseling during which the counselor facilitated discussion by providing empathetic support, encouragement and reframing the stressors confronting Plaintiff (Tr. 736-765).

From May through July 28th, Plaintiff was treated by a physician assistant for bipolar disorder and post traumatic stress disorder (Tr. 779).  In her opinion, Plaintiff's ability to deal with co-workers

would be situational and her attendance would depend on the physical requirements of the job.  She could

sustain attendance if adequately medicated (Tr. 780-781).   Plaintiff had a fair ability to make

occupational adjustment, a fair to good ability to make performance adjustments and a good to poor

ability to make personal-social adjustments (Tr. 789-790).

## STANDARD FOR DISABILITY

To establish entitlement to disability benefits, a claimant must prove that he or she is incapable

of doing substantial gainful activity due to a medically determinable physical or mental impairment

which can be expected to last for a period of twelve months or results in death.  *Murphy v. Secretary of*

*Health and Human Services*, 801 F. 2d 182, 185 (6th Cir. 1986) (*citing* 42 U. S. C. § 423(d)(1)(A)

(1986)).  The claimant must show that his or her impairment results from anatomical, physiological or

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory

diagnostic techniques derived from acceptable medical sources.  20 C.F.R. §§ 404.1513, 404.1528

(Thomson/West 2007).

To determine disability, the ALJ uses a five-step sequential evaluation process, namely, (1)

whether claimant is working; (2) whether claimant has a severe impairment; (3) whether claimant's

impairment(s) meets or equals a listed impairment in Appendix1 of Subpart P of Part 404, Listing of

Impairments; (4) whether the impairment prevents the claimant form doing past relevant work; and (5)

whether the impairment prevents the claimant from doing any other work.  20 C.F.R. § 1520(a)-(f)

(Thomson/West 2007).

During the first four steps, the claimant has the burden of proof.  *Walters v. Commissioner of*

12

*Social Security*, 127 F. 3d 525, 529 (6th Cir. 1997) (*citing Young v. Secretary of Health and Human Services*, 925 F.2d 146, 148 (6th Cir. 1990); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987)). This burden shifts to the Commissioner only at step five. *Id.*

Initially, consideration is given to whether the claimant is working or has no impairment or combination of impairments which significantly limit physical or mental abilities. A finding that the claimant is not disabled will ensue despite medical condition, age, education, and work experience if the claimant is working. When an impairment meets the durational requirement and meets or equals a listed impairment in Appendix 1, a determination of disabled will issue without consideration of age, education or work experience. If a decision cannot be made based on current work activity or on medical facts alone, and a severe impairment(s) exists, the ALJ must review the claimant's residual functional capacity (RFC) and the physical and mental demands of past relevant work. If the claimant can still do this kind of work, the ALJ will find the claimant not disabled. If the claimant cannot do any past relevant work because of the impairment, further consideration of the claimant's RFC, age, education and past work experience is explored to determine if the claimant can do other work. If the claimant cannot do other work, the ALJ must find the claimant disabled.

## ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

1.    Plaintiff met the disability insured status requirements of the Act on February 14, 2002 and she continued to meet the requirements through December 2007.

2.    Plaintiff had not engaged in substantial gainful activity since February 14, 2002.

13

3.      Plaintiff had the following impairments:  anxiety disorder, depressive disorder and residuals of multiple bilateral knee surgeries.  These impairments adversely affected her capacity for basic work activity and were therefore severe for purposes of the Act.  However, the severity of these impairments did not meet or equal the level of severity described in Appendix 1, Subpart P, Regulation No. 4.

4.      Plaintiff was capable of performing the basic exertional requirements of light work except that she could not be expected to stand or walk for a total of more than four or five hours per day or to climb, kneel or crawl.  There were no restrictions on sitting.  She was limited to a low-stress, mostly independent project type work which did not involve close contact with co-workers or supervisors or any interaction with members of the general public.

5.      Plaintiff's allegations of total disability were not supported by substantial objective medical evidence or clinical findings.  Such allegations were not proportionate to the objective evidence in the record.

6.      Plaintiff, a younger person, with post high-school education and transferrable work skills, has the residual functional capacity for a full range of light work reduced by the restrictions in number four above.

7.      Based on her capacity for a full range of light work reduced by the functional limitations, there were a significant number of jobs in the national economy that Plaintiff could perform, namely, the positions of audit clerk, accounting clerk and adjustment clerk.

8.      Given Plaintiff's exertional capacity for light work, age, education and work experience, 20 C. F. R. § 404.1569 of Regulation No. 4 and Vocational Rules 202.20 and 202.22, Tables No. 2, Appendix 2, Subpart P, Regulations No. 4, direct a conclusion of not disabled.

9       Plaintiff was not under a disability as defined in the Act at any time through the date of the decision or September 25, 2005.

(Tr. 38-40).

## STANDARD OF REVIEW

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions.  *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994).  Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards.  *Id.* (*citing*

14

*Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.* (*citing Kirk v. Secretary of Health and Human Services*, 667 F. 2d 524, 535, (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983)).  The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Id.* (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole.  *Id.* (*citing Kirk,* 667 F. 2d at 536).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently.  *See Kinsella v. Schweiker*, 708 F. 2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F. 2d 535, 545 (6th Cir. 1986) (en banc).

## DISCUSSION

Plaintiff cites three errors that the ALJ made in establishing her entitlement to disability benefits. First, the ALJ's assessment of Plaintiff's residual functional capacity is erroneously based on the opinion of the ME and not the opinions of her treating psychiatrist, Dr. D'Souza and the consultative examiner, Dr. McIntosh.  Second, the ALJ relied on the opinion of Dr. Duritsch to the exclusion of the opinion of Dr. Mesker.  Third, the ALJ erred in the assessment of Plaintiff's credibility.

Plaintiff's first argument is that the ALJ erred in failing to adopt the conclusions of Drs. McIntosh

15

and D'Souza in assessing her residual functional capacity.  Instead the ALJ relied upon the findings of the ME who did not evaluate Plaintiff or maintain a treating relationship.  Defendant argues that when the record is considered as a whole, the opinions of Drs. McIntosh and D'Souza could not be accepted as they were not consistent with the other evidence of record.

ALJs are responsible for reviewing the evidence and making findings of fact and conclusions of law.  20 C. F. R. §404.1527(f)(2) Thomson/West 2008).  They may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments and whether such impairment(s) equal the requirements of any impairment listed in Appendix 1 to this subpart.  20 C. F. R. § 404.1527(f)(2) (iii) (Thomson/West 2008).  When the ALJ considers these opinions, he or she will evaluate them using the rules 20 C. F. R. § 494.1527(a)-(e)[2].

Generally, the opinions of treating physicians are given substantial, if not controlling, deference. *Warner v. Commissioner of Social Security,* 375 F. 3d 387, 390 (6th Cir. 2004) (*citing King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984); 20 C.F.R. § 404.1527(d)(2)).  Treating physicians' opinions are only given such deference when supported by objective medical evidence. *Id.* (*citing Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003).  "The determination of disability is [ultimately] the prerogative of the

---

[2]

     In sum, 20 C. F. R. § 4041527(a)-(e) establishes the criteria for consideration of medical opinions.  The claimant can only be found disabled if he or she is unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  The impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  Every source of medical evidence will be evaluated.  Treating sources, supported by medically acceptable clinical and laboratory diagnostic techniques and that are consistent with the other substantial evidence in the case record, will be given controlling weight.  When the treating source's opinion is not given controlling weight, good reasons for the weight given will be provided in the notice of determination.  The Commissioner is responsible for making the decision of whether the claimant's impairment meets the statutory definition of disability.

16

[Commissioner], not the treating physician." *Id.* (*citing Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985)).

In this case, the ALJ asked for and considered the opinions of the ME solely on assessing the nature and severity of Plaintiff's impairments and whether such impairment(s) equals the requirements of any impairment in the Listing (Tr. 32-33). There is no indication that he relied upon the ME to determine disability or that he substituted the ME's conclusions for those of Drs. McIntosh and D'Souza.

The ALJ did not give substantial deference to the opinions of Drs. McIntosh and D'Souza since neither opinion is supported by objective medical evidence. Dr. McIntosh's opinions are based solely on Plaintiff's recitation of the facts. At the time of her interview with Dr. McIntosh, Plaintiff was attending college (Tr. 49). This fact is not referenced in Dr. McIntosh's description of Plaintiff's daily exercises nor considered in the assessment of Plaintiff's ability to understand, remember, carry out instructions, comprehend and concentrate. Moreover, there are no laboratory or diagnostic tests to confirm his ultimate findings (Tr. 693). This report lacks the appropriate foundation on which to bind the ALJ.

Dr. D'Souza completed a medical questionnaire in which she noted that Plaintiff suffered from depressive and manic symptoms (Tr. 724). She failed to attach her progress notes, clinical findings, frequency of contact or treatment progress. Simply, there is no objective medical evidence to substantiate her conclusions (Tr. 34-35). There is nothing in her report to bind the ALJ.

Next, Plaintiff argues that the ALJ erred in not attributing controlling weight to Dr. Mesker's opinion since he is the only physician that commented on the interaction between Plaintiff's physical and

17

mental impairments.  Alternately, the ALJ erred by failing to explain why he did not attribute controlling weight to Dr. Mesker's opinion.  Defendant submits that the ALJ correctly attributed more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the pinion of a source who is not a specialist.

It is well established that the SSA will give a treating source's opinion "controlling weight" unless it is either not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record."  *Smith v. Commissioner of Social Security,* 482 F.3d 873, 877 (6th Cir. 2007) (*citing* 20 C.F.R. § 404.1527(d)(2)).  "There is a rebuttable presumption that these medical professionals are most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians.  *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007) (*citing* 20 C.F.R. § 416.927(d)(2)).  When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

The ALJ conducted a thorough analysis of Dr. Mesker's record when assessing Plaintiff's residual functional capacity (Tr. 30, 31).  He adopted Dr. Mesker's opinions to the extent that they were consistent with the results of the more recent examination by Dr. Duritsch, a specialist.  However, when

Dr. Mesker's records are carefully reviewed, it is noted that he modified Plaintiff's medication according to her complaints.  He treated her for the occasional common cold, headache and persistent upper respiratory inflammation, persistent knee pain and allergies (Tr. 596, 597, 599, 602, 604, 606, 609, 612-615, 621, 622, 626, 628, 635, 640, 641, 643 644, 645, 646, 648).  Periodically, he noted that Plaintiff was depressed or showed signs of anxiety.  However, Dr. Mesker, failed to employ medically acceptable clinical and laboratory diagnostic techniques from which the ALJ could conclude that Plaintiff had a psychological or anatomical impairment expected to last for the requisite one year period or of the severity to be considered disabling.  The ALJ was not obligated to attribute controlling weight to Dr. Mesker's unsubstantiated opinions that Plaintiff had an underlying disability that affected her residual functional capacity.

The ALJ discounted Dr. Mesker's opinion with respect to Plaintiff's mental impairment for the reasons that Dr. Mesker was not trained to assess mental impairments.  Moreover, Dr. Mesker failed to conduct the requisite mental impairment evaluation established in 20 C. F. R. § 404.1520a.  Specifically, there is no documentation that he employed the special technique and used the technique to evaluate mental impairment.  Dr. Mesker's opinion was based entirely on Plaintiff's subjective complaints. Absent the critical analysis of the mental impairment, Dr. Mesker's opinions regarding Plaintiff's mental impairment are not probative of Plaintiff's mental health.

Finally, Plaintiff claims that the ALJ's assessment of her credibility is based on an erroneous interpretation of the facts.  Defendant argues that the ALJ properly evaluated Plaintiff's credibility in determining her ability to perform work.

Credibility determinations regarding subjective complaints rest with the ALJ. *Rogers, supra*, 486 F.3d at 249. Those determinations must be reasonable and supported by substantial evidence. *Id.* An ALJ's credibility determinations about the claimant are to be given great weight, "particularly since the ALJ is charged with observing the claimant's demeanor and credibility." *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 542 (6th Cir. 2007). In assessing credibility, the ruling in SSR 96-7p emphasizes:

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well- reasoned determination or decision.
>
> In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible. The adjudicator may also find an individual's statements, such as statements about the extent of functional limitations or restrictions due to pain or other symptoms, to be credible to a certain degree.

Initially, Plaintiff claims that the credibility determination is flawed as the ALJ misconstrued the record regarding the treatment of Dr. Smith, erroneously found that she was seeing several mental health providers simultaneously and erred in relying on her ability to engage in daily activities. It was within

20

his discretion to find that Plaintiff's claim was incredible to a certain degree.

It is clear from the record that Dr. Smith failed to treat Plaintiff after she attempted to retain her to provide a medical consultation in conjunction with a legal matter.  Under the circumstances presented in the record, the Magistrate cannot find that the termination of the relationship was not the result of this transaction.

The medical record also shows that Plaintiff was undergoing intense outpatient services at Miami Valley Hospital while being treated by Dr. Predieri for major depression (Tr. 349, 498).  During the course of treatment with Dr. Predieri, she was diagnosed by a social worker and Dr. Smith for depression (Tr. 342).  However, at least once monthly from January to April 2004, Plaintiff was undergoing treatment by a licensed social worker.  Dr. D'Souza commenced treatment in February and in April, Dr. Mesker diagnosed her with depression (Tr. 585, 723).  The medical records show that Plaintiff was seeing several mental health professionals at one time.   The Magistrate cannot find that the ALJ misconstrued these facts.

Finally, Plaintiff claims that her ability to perform daily tasks at her own pace is not indicative of her ability to function in a competitive environment.  In support of her proposition, Plaintiff cites *Hunter v. Commissioner of Social Security*, 2006 WL 2092411 (E. D. Mich. 2006) (unreported).  In *Hunter,* the court erred because it relied primarily on the plaintiff's testimony to conclude that the plaintiff had the capacity for light work.

The ALJ in this case did not rely on an intangible or intuitive notion about Plaintiff's credibility.  Since there was no evidence in the record to support her claim of severe functional limitations or that her

21

performance of tasks intermittently automatically precluded the performance of sustained employment, the ALJ did not presume that Plaintiff was relegated to performing daily tasks at her own pace.  Instead, the ALJ recited the factors described in the regulations that must be articulated in determining credibility. He expounded on those factors by giving specific reasons for the finding on credibility.  He considered Plaintiff's testimony and her functional level in addition to her daily activities to determining that she could function in a work environment.  The ALJ found this suggestion incredible.  Since his credibility analysis comports with the Administration's requirements and are well supported by the ALJ's observations and/or evidence in the record, the Magistrate defers to the ALJ's credibility finding.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Dated: March 21, 2008

22